NEW ENGLAND TELEPHONE & TELE-
GRAPH COMPANY, Defendant,
Appellant,

v.

Basil L. REED, Plaintiff, Appellee.

NEW ENGLAND TELEPHONE & TELE-
GRAPH COMPANY, Defendant,
Appellant,

v.

Gordon E. GLIDDEN, Plaintiff, Appellee.

Nos. 6278, 6279.

United States Court of Appeals
First Circuit.

Aug. 31, 1964.

See also D.C., 175 F.Supp. 409.

Stanley M. Burns and Joseph P. Nadeau, Dover, N. H., with whom Burns, Bryant & Hinchey, Dover, N. H., was on brief, for appellant.

James J. Kalled, Wolfeboro, N. H., for appellees.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

These are appeals from judgments of the United States District Court for the

District of New Hampshire, entered on November 27, 1963, following a jury trial, awarding plaintiffs-appellees, Basil L. Reed and Gordon E. Glidden, the sum of $75,000 and $30,000, respectively, in their personal injury actions against defendant-appellant, New England Telephone & Telegraph Company.

Appellees were employed as linemen by the Wolfeboro Municipal Electric Company of Wolfeboro, New Hampshire. They sustained their injuries on August 30, 1954 while removing an electric company transformer from a utility pole jointly owned by appellant and the electric company. The extension of the northerly wing of the nearby Carpenter School made it necessary to re-route the wires of both companies so as not to interfere with the new construction. Because of the change-over the transformer was no longer needed. The pole itself was to be taken down at a later date.

The pole was a Norway 30-6, standing twenty-five feet above the ground and extending five feet into the ground. It was of the class 6 variety, which meant that, if unguyed, the pole would break at the ground level when a horizontal force of 1,500 pounds was applied two feet from the top of the pole. Defendant's equipment on the pole consisted of a J or drive hook inserted in the easterly side of the pole fifteen feet above the ground to which were attached two of its drop lines. The electric company occupied the top ten feet of the pole and its equipment consisted of double cross arms about nine inches below the tip of the pole, one on the northerly and the other on the southerly side, each being a four pin. Attached to the inner pins were two 2,400 primary wires. On the outer pins were the street light wires. On the top cross arms were lightning arresters and Kearney cut-outs. The electric company transformer was attached to the pole by means of brackets extending over the northerly cross arm. The transformer was made of steel and filled with oil and weighed 750 pounds. It was thirty-six inches in height and twenty-four inches in diameter and was of the 25 KVA class.

On the day of the accident the electric company line crew consisted of six men, including appellees. Reed was sent up the pole to unfasten and remove the transformer. He had been with the electric company for eight years. Before climbing the pole, he glanced at it and it appeared to be all right. When he got up ten or twelve feet, he shook it and it appeared solid. Upon arriving at the top he belted himself onto the pole with his safety straps and then Glidden went up the pole. Glidden had been with the company for over one year. Reed disconnected the cut-outs and arresters and the primaries going into the top of the transformer while Glidden disconnected the secondaries as they came out from the north side of the transformer. A twenty-five pound metal cage with a single snatch block hooked thereto was then sent up and Reed attached it to the top of the pole where it would act as a fulcrum for the force about to be applied to the pole in order to lift the transformer off the cross arm. The next thing sent up was a cable which was attached to a winch located just behind the cab of the electric company's utility truck. The cable ran from the winch to the rear of the truck, under the dolly bar located there and came up over the front of the transformer and through the snatch block at the end of the cage. Reed wrapped a chain around the ears of the top of the transformer and connected it to the eye in the end of the cable. The transformer had to be raised at least two inches if the overlapping brackets were to clear the cross arm. Reed gave the signal to take up some tension on the cable. The tension was taken up but the brackets did not fully release. He signalled for more tension and the brackets still failed to release from the cross arm. Reed then changed his position on the pole and placed his heavy duty screw driver under the right bracket in an attempt to pry it loose. The tension created snapped the pole and the top four feet broke off.

The weight of the testimony disclosed that the line crew failed to attach a snatch block to the base of the pole which would have enabled the cable to come up the pole vertically. Instead, as shown above, the cable went directly from the dolly bar at the rear of the truck, which was located seven to fifteen feet from the base of the pole, over the front of the transformer, to the cage. The sloping cable thus not only pressed the transformer against the cross arm, requiring additional tension to release the brackets, but caused excessive leverage on the top of the pole and created an angular force which succeeded in snapping the pole when tension was applied by the winch and by Reed's screw driver. A member of the line crew testified that although smaller transformers had been removed without using a snatch block at the base of the pole, this was the first time he had seen it attempted with a transformer of the 25 KVA class. Appellees' safety expert admitted that the method used by the electric company would snap any pole at the point where it was guyed if sufficient tension was exerted on the pole.

The pole broke at the point where the electric company had bored two holes through it for a southerly and a westerly guy. The hole for the eye bolt for the southerly guy had been bored about four feet down from the top of the pole and ran in a north-south direction. The hole for the eye bolt for the westerly guy ran in an east-west direction and was located about two inches above and at right angles to the hole bored for the southerly guy. Both holes had been bored before the end of July 1954. The exact date was in dispute although Reed testified that when he examined the pole two to four months following the accident he believed both holes to have been six months old and to have been bored at the same time. The manager of the electric company testified that were it not for the holes the pole would not have broken.

At the trial appellees claimed the negligence of appellant consisted of its breach of duty to provide appellees with a sound pole and to warn them of any defects in the pole which could make hazardous their presence on it while engaged in their usual work. Appellant's duty toward appellees was claimed to have arisen out of its co-ownership and custodianship of the joint pole, placing upon appellant the duty to exercise ordinary care in providing appellees with a safe place to work.

The pole was selected and installed by the electric company in 1941. Appellant acquired a joint interest therein in 1944 under an "open-end" additional-pole-acquisition provision of a contract entered into in 1920. A joint ownership contract dated December 18, 1953, cancelled all previous contracts between the parties but preserved their joint interests in the subject pole as well as in others. The new contract purported to define rights, duties, obligations, etc., of the parties thereto in the jointly owned poles. Because of efficiency and economic considerations the parties had previously assigned custody of the various joint poles between them. Appellant had custody of the subject pole and under the new contract its duties were as follows:

> "The custodian shall maintain jointly owned poles in its custody in safe and serviceable condition in accordance with the specifications mentioned in Article III and shall replace, reinforce or repair such of said poles as become defective."

The contract stated that all jointly owned poles were to be class 5, 35 foot poles unless otherwise directed by the specifications. The specifications stated that the subject pole was to be a 30 foot pole, without mentioning the class of the pole. In fact, the pole was a 30 foot, class 6 pole, although it exceeded the circumference requirements of a class 5 pole. The amount of horizontal pull needed to break a class 5 pole at ground level is 1,900 pounds whereas only 1,500 pounds of pull is needed to break a class 6 pole. Appellees contended that because the pole was not a class 5 as required by the contract, they did not have sufficient margin of safety while working on it. At the time of the accident the weight

upon the pole, including the weight of appellees, exceeded 1,240 pounds. The winch had a capacity pull of 9,000 pounds although it is not known how much of this capacity was utilized in trying to raise the transformer. An additional 750 pounds of force was needed just to equalize the weight of the transformer before it could be lifted. A class 5 pole would have given appellees a margin of safety of at least an additional 400 pounds before the pole would break. Appellees' safety expert gave his opinion that the pole was undersized for the large transformer placed upon it and probably did not have a factor of safety capable of handling any excess weight or force above the weight of the transformer. The manager of the electric company testified that the company would not currently install a 25 KVA transformer on a class 6 pole, partially because the margin of safety is too narrow. He also testified that the lack of a proper safety margin was a substantial cause of the breaking of the pole.

 Appellant's duty towards appellees arose from its status as co-owner of the pole, with appellees as invitees, Derosier v. New England Telephone & Telegraph Co., 81 N.H. 451, 130 A. 145 (1925), and from its status as custodian of the pole with the contractual duty of maintaining the pole "in safe and serviceable condition" and its duty to "replace, reinforce or repair such of said poles as become defective." As co-owner and custodian, appellant assumed a duty to appellees to do what the ordinary person in appellant's situation would have done to make the pole a safe place for appellees to work. Derosier, supra. This duty included the obligations to provide appellees with a sound pole. Murphy v. Rochester Telephone Co., 208 App. Div. 392, 203 N.Y.S. 669 (1924), aff'd, 240 N.Y. 629, 148 N.E. 735, and to make inspections of the pole so as to discover possible defects. Derosier, supra. There was evidence that the standard practice in New Hampshire between electric and telephone utilities was that telephone employees were not permitted to go on to

that portion of the pole above its equipment and if there was any defect in the pole above the telephone equipment, the telephone company relied upon the electric employees to notify the telephone company of such defect, and then the telephone company would be required to repair or replace the pole, and the expense would be shared between the parties. But while this evidence is receivable as some evidence of due care, it is not to be taken as fixing a legal standard for the conduct required by law and "a jury may find from other evidence that the defendant was in fact negligent." Bouley v. Tilo Roofing Co., 90 N.H. 402, 10 A.2d 219 (1939). For instance, a jury could find from the evidence presented that defendant had been aware many years before the accident of the poor safety practices of the electric company and could thus determine that a prudent person would not have relied on the electric company but would have himself inspected to determine that defects in the pole did not exist. Derosier, supra.

 The district court correctly interpreted the contract as requiring appellant, as custodian, to provide support for the equipment on the pole, which would include the guying of the pole. Derosier, supra. Under the contract, therefore, any defect appearing in the pole which resulted from an attempt to support the pole through guying was chargeable to appellant and appellant was under a duty to discover and warn of, or correct the defect. This was in addition to its duty as co-owner to use ordinary care to insure the safety of its invitees, which duty could not be delegated to any third party. Frear v. Manchester Traction, Light & Power Co., 83 N.H. 64, 139 A. 86, 61 A.L.R. 1280 (1927); Stevens v. United Gas & Electric Co., 73 N.H. 159, 60 A. 848, 70 L.R.A. 119 (1905). The conflicting evidence as to when the holes were bored left it for the jury to determine whether or not defects existed a sufficient time prior to the accident so that appellant knew or should have known of them. It was also for the jury to consider what part appellees played in the boring of the holes and

whether they had such knowledge thereof as would excuse appellant from giving them further warning.

■■ From the evidence introduced at the trial by appellees, a jury could find that the undersized pole and/or the holes bored in the pole were "a substantial factor in bringing about the harm" regardless of whether the electric company was also negligent in taking down the transformer. Unless, as a matter of law, appellant owed no duty to appellees, this was all that was needed to present to the jury the question of which negligent act was the proximate cause of the appellees' injuries. Maxfield v. Maxfield, 102 N.H. 101, 151 A.2d 226 (1959); Terrien v. Pawtucket Mut. Fire Ins. Co., 96 N.H. 182, 71 A.2d 742 (1950). "When an issue of proximate cause arises in a borderline case, as not infrequently happens, we leave it to the jury with appropriate instructions." Marshall v. Nugent, 222 F.2d 604, 611, 58 A.L.R.2d 251 (1st Cir. 1955). If the jury should find that the injuries resulted from two separate and distinct acts of negligence committed by different persons operating concurrently, then both are regarded as the proximate cause and recovery can be had against either or both. Hannah v. Gulf Power Co., 128 F.2d 930 (5th Cir. 1942); see also Derosier, supra. If defendant was guilty of allowing a negligent condition to continue to exist, the fact that it might not have been able to foresee the exact manner in which the injury might occur affords it no defense. Maxfield v. Maxfield, supra; Derosier, supra.

■ The question of the contributory negligence of appellees, if any, was for the jury to consider. Negligence on the part of the electric company could not be imputed to appellees, see Clough v. Schwartz, 94 N.H. 138, 48 A.2d 921 (1946) nor could the doctrine of "assumption of risk" be applied to them. Brosor v. Sullivan, 99 N.H. 305, 109 A.2d 862 (1954). Appellees were under no obligation to make more than their usual inspection before climbing the pole, Murphy v. Rochester Telephone Co., supra,

but had a right to rely to a reasonable extent upon the duty of defendant to use due care to determine that the pole was reasonably safe. Derosier, supra.

■ We believe the district court was correct in excluding from the jury's attention Article XIV of the 1953 joint pole agreement. The Article was entitled "Liability and Damages" and related exclusively to matters of indemnity and payment of damages between appellant and the electric company after liability for such damage had been incurred and the damages awarded. It was, therefore, not material to the issues involved in this case and by withholding it from the jury the trial court wisely avoided the danger of the jury's reading the Article's provisions literally and erroneously deciding that the indemnity agreement between appellant and electric company limited the rights of appellees to recover.

The question of whether or not a Safety Code published by the National Bureau of Standards and adopted by the New Hampshire Public Utility Commission for its guide in determining standards of pole line construction practices for electric utilities was admissible as an indication of the ordinary care appellant was required to exercise need not be considered since the Code never went into evidence and thus could not have been taken into account by the jury in determining what constituted ordinary care under the circumstances.

The trial judge's charge to the jury fairly reflected the law involved and was substantially correct. Much of the charge that appellant took exception to we have already discussed and other allegations of error, even if correct, were not serious enough to prejudice appellant in its rights.

■ There was sufficient evidence in the record which, if believed by the jury, would not make unreasonable the amounts of damages awarded to appellees even if the awards were somewhat liberal. Certainly, we cannot say that the awards were "outrageously excessive" or shocking to the conscience of the court

from all the facts and circumstances disclosed in the record. United States v. Grigalauskas, 195 F.2d 494 (1st Cir. 1952).

It follows from what we have said that we do not believe the lower court erred in refusing to grant appellant's Motion to Set Aside Verdict, for Judgment Non Obstante Veredicto, and/or New Trial in each of the above cases.

Judgment will be entered affirming the judgments of the district court.