**M. C. CARLISLE & CO., Inc., Defendant, Appellant,**

v.

**Robert W. CROSS, Plaintiff, Appellee.**

**No. 6904.**

United States Court of Appeals First Circuit.

Dec. 5, 1967.

---

4. This opinion has been submitted to all members of the Court and they are in accord with this result.

John M. Hall, Boston, Mass., with whom Weld S. Henshaw, Thomas E. Cargill, Jr., and Choate, Hall & Stewart, Boston, Mass., were on brief for appellant.

Stephen A. Hopkins, Boston, Mass., with whom Timothy H. Donohue and

**673**

Sherburne, Powers & Needham, Boston, Mass., were on brief, for appellee.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

This diversity action arose out of an explosion that occurred in June 1962 in the sander dust disposal system at the Plywood Products woodworking plant in North Stratford, New Hampshire. As a result of the explosion plaintiff, a Plywood employee who at the time was working on the system, sustained severe burns. He brought this suit against M. C. Carlisle & Co., Inc., a Boston sheet metal work firm, alleging that his injuries were caused by Carlisle's negligence in the design, manufacture and installation of the system.

This is the second trial and the second appeal in this case. The first trial ended in a directed verdict for the defendant but on appeal we reversed and remanded the case for a new trial. Cross v. M. C. Carlisle & Co., 368 F.2d 947 (1st Cir. 1966). The new trial resulted in a substantial verdict for plaintiff. At this trial defendant twice moved for a directed verdict but the court denied these motions and submitted the case to the jury.[1]

Defendant's principal contention on appeal is that the trial court erred in not directing a verdict in its favor. Much of the evidence with reference to the physical setup and operation of the dust disposal system in question is substantially the same as that produced at the first trial. This evidence is set forth in detail in our earlier opinion and although essential to a proper understanding of this case will not be repeated here.

[1] After the jury had returned a verdict for the plaintiff for $77,158.50 the court propounded the following special questions:
1. "Was the damper of the type installed by Carlisle an appropriate and reasonably safe kind of device for Carlisle to have designed, manufactured and installed?"
2. "Was this particular damper constructed and fitted in place sufficiently tightly so as to be reasonably safe?" The jury answered "No" to both questions.

In view of our prior holding[2] the evidence of liability introduced at the second trial was directed entirely to the issue of whether Carlisle was negligent in designing, manufacturing and installing the fire damper and whether this negligence was the proximate cause of plaintiff's injuries. This was a secondary issue at the first trial, the emphasis there being primarily on the alleged defects in the tail pipe.

The fire damper in question is a piece of steel plate one-eighth of an inch thick and about thirty-six inches long installed on an angle and swiveled on a rod that runs across the top and protrudes through the sides of the rectangular shaped duct in which it is enclosed.[3] It is located at or near the point where the feeding duct enters the separator. When the blower is on, the damper opens to a horizontal position but when it is off the damper is supposed to close by its own weight and seal off the feeding duct. The only way one can tell whether the damper is open or shut is from the position of the handle on the top of the rectangular duct. It is undisputed that the blower had been off for three days when this explosion occurred. The housing on the blower was partly dismantled and plaintiff and two other Plywood employees were on the platform in the boiler room working on it. There was a boom and suddenly flames flashed through the eye of the blower engulfing the plaintiff.

He contends that the initial combustion took place in the separator,[4] that the flames passed around the edges of the fire damper igniting other wood dust and air in the duct leading to the blower and as a result flames emerged from the eye of the blower where plaintiff was working. The specific negligence alleged is that the fire damper in question was deficient as a safety device in that it did not contain the flames in the separator and prevent them from travelling back through the system. In support of this theory of recovery plaintiff produced the same witnesses he relied upon at the first trial. Their testimony, however, was considerably more extensive on the fire damper issue.

 As we stated at p. 953 of our opinion on the first appeal in discussing the matter of sufficiency of evidence on a motion for a directed verdict,

"In this circuit a scintilla of evidence is not enough. Magnat Corporation v. B & B Electroplating Co., 358 F.2d 794 (1st Cir. 1966). Conclusions of fact must be supported by substantial evidence. This means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. United States v. Krumsiek, 111 F.2d 74, 78 (1st Cir. 1940). In Rainey v. Gay's Express, Inc., 275 F.2d 450, 451 (1st Cir. 1960), we quoted with approval the principle to be applied by this court in reviewing the record on the question of the sufficiency of evidence on a motion for a directed verdict. This principle was stated as follows:

" ' * * * In determining whether or not the evidence in a given

2. At the first trial plaintiff produced evidence (1) that Carlisle failed to equip the tail pipe with proper safety devices, and (2) that it did not use reasonable care in designing, manufacturing and installing the fire damper. Applying New Hampshire law, we upheld the trial court in directing a verdict on the tail pipe issue but found that there was sufficient evidence of negligence to go to the jury on the damper issue and on the question of whether this was the proximate cause of plaintiff's injuries. See Cross v. M. C. Carlisle & Co., supra, 368 F.2d at 952–953.

3. This rectangular shaped box or duct is approximately forty-eight inches long, thirty inches high and fifteen inches wide. One end is open to the separator and the other open end connects to the circular duct running back to the blower.

4. There is no damper in the tail pipe and no covering over the entrance to it. Plaintiff claims that the initial explosion was caused by a burning ember from the fire hole being drawn by a natural draft up through the open tail pipe into the separator where it ignited a mixture of wood dust and air.

case is sufficient to take the case to the jury over a motion for directed verdict, the evidence must be viewed in the light most favorable to the plaintiff, giving the plaintiff the benefit of every inference favorable to him which may be fairly drawn. It is not for the court to weigh the conflicting evidence or to judge the credibility of witnesses. Whenever the evidence is such that fair-minded men may draw different infer-, ences therefrom, and reasonably disagree as to what the verdict should be, the matter is one for the jury. * * * ' "

■ Reviewing the evidence in the light of these principles, we note that first of all there is ample evidence that the explosion which initiated the train of events leading to plaintiff's injuries occurred in the separator. Also, that Plywood is chargeable with sloppy housekeeping in allowing numerous small fires to burn almost constantly on the boiler room floor in the vicinity of the fire holes. There is evidence, however, that this condition which existed as late as June 1962 must have been known to Carlisle. It was further established that this explosion was by no means the first of its kind in this system. Only three months earlier there was another one in which this same damper and separator were badly damaged.[5] Indeed, several other less violent explosions occurred in this system in the seven years since 1955 when Carlisle installed it. During this period Carlisle was the only firm that serviced and repaired the system. There is evidence that Kamilewicz, a long time

Carlisle employee who helped to install it, was at the Plywood plant two or three times a year since 1955, yet at no time up to March 1962 did he inspect the damper or separator. Nor did Lavin, the president of Carlisle, ever inspect the damper or separator subsequent to their installation.

Kamilewicz's testimony, as well as that of Lavin, is of particular significance on the fire damper issue. Both stated that Carlisle designed, manufactured and installed this damper and the box or duct in which it was enclosed.[6] This is also true of the separator and the duct work but the blower in use at the time Carlisle first came on the scene was incorporated in the new set-up. Moreover, Lavin acknowledged that as designer of this system he knew that wood dust was apt to accumulate in it; that this is a highly combustible substance and some provision had to be made to guard against fire.[7] He stated that he was also aware of the likelihood of fire coming through the separator if there was combustion there when the system was off. He admitted that one of the purposes of the damper was to prevent this from happening[8] but Kamilewicz testified that this was the principal purpose of this damper. More important still is the testimony of these two witnesses with reference to the design and construction of the damper as well as of the box or duct in which it was enclosed.

Lavin stated unequivocally that when the damper closes it comes into contact with the bottom of the damper box and stops there; that there are no grooves at the bottom of the box into which it might lock but that there are shoulders

---

5. In the March 1962 explosion the sides of the box in which the damper was located were bulged outward and had to be straightened. The damper itself was bowed in the direction of the blower. It was also jammed against the bottom of the box and was straightened by hand. Also the interior of the separator was badly damaged and had to be repaired. All this repair work was done by Carlisle shortly after the explosion. Shortly after the June 1962 explosion Carlisle replaced the damper and separator.

6. When delivered to the plant in 1955 the damper came with and was attached to the separator.

7. This is one of the reasons why he instructed the Plywood employees to swing the end of the tail pipe away from the fire holes when the blower was not in operation.

8. The other purpose was to prevent cold air from coming into the plant through the top of the separator when the system was off.

that run from top to bottom on both sides of the damper box and at the same angle as the damper would be when closed; and that the sides of the damper lay on and set against these shoulders when it is closed.

■ On the other hand, Kamilewicz who had helped to install this damper originally and who examined it immediately after the March 1962 explosion, testified very definitely that it was a "close fitting damper"; that there were no stops or shoulders at all on the sides of the damper box; and although when closed the damper was flush against the bottom of the box, there was about one-sixteenth of an inch clearance on each side of it and this is the way the damper was when it was installed. According to this latter testimony, the damper was not installed in the way Lavin, its designer, thought that it was or that it ought to be. There was no evidence that Plywood knew or should have known of this condition so as to relieve Carlisle of liability under the rule in Russell v. Arthur Whitcomb, Inc., 100 N.H. 171, 121 A.2d 781 (1956).

■ In our opinion this testimony is crucial to the issue before us and was sufficient to take the case to the jury over a motion for a directed verdict. It raised the factual question of the adequacy of the damper as a safety device which of course is a jury question, and from it we think the jury could reasonably find, as it did, that the damper was not "constructed and fitted in place sufficiently tightly so as to be reasonably safe." Also, plaintiff called as an expert witness an electrical engineer named Kusko who supported plaintiff's theory of how the fire that engulfed the plaintiff happened as a result of an explosion in the separator. Defendant makes a strong attack upon the competency of this witness to express an expert opinion in a case of this kind. Arguably this expert's qualifications were solely in the field of electricity, not warranting him to give such an opinion. We note, however, that his credentials also included some eight or ten years recent experience as a consulting engineer in which he had had occasion to work on internal combustion engines and to investigate explosions allegedly caused by electricity igniting either gas or chemicals, some of this being related to his earlier doctoral studies of compressed gas installations. Inasmuch as his own explanation of the accident was based on the movement and combustion of gaseous substances (air and air mixed with wood dust), we cannot say that this kind of phenomenon lay outside of his professional experience. Moreover, he was fully qualified to express an opinion that electricity was not a cause, which he did, and in some measure the choice of a negative may involve weighing a particular positive. We also note that defendant's theory of the accident to some extent involved electricity and this made Kusko's negative testimony highly material. Under these circumstances we cannot say that the trial court exceeded or abused its discretion in admitting Kusko's testimony.[9]

Applying the legal principles above stated and also in view of the liberal policy expressed by the New Hampshire Supreme Court, we think there was sufficient evidence to go to the jury on the issue of Carlisle's negligence with regard to the damper and that the jury could reasonably find that this negligence was the proximate cause of plaintiff's injuries. See Maxfield v. Maxfield, 102 N.H. 101, 151 A.2d 226 (1959); see also Gobrecht v. Beckwith, 82 N.H. 415, 135 A. 20 (1926); Derosier v. New England Telephone & Telegraph Co., 81 N.H. 451, 130 A. 145 (1925).

Affirmed.

9. Plaintiff also called as an expert witness a consulting engineer named Wise who testified on the question of the adequacy of the damper as a safety device but in view of the jury's answer to the first special question which we find supported, it is unnecessary to consider Wise's testimony.