Harold A. NEWTON et al., etc.,
Plaintiffs, Appellants,

v.

ROCKWOOD & CO., Defendant,
Appellee.

No. 6871.

United States Court of Appeals
First Circuit.

Heard May 1, 1967.

Decided June 13, 1967.

William J. Murphy, East Longmeadow, Mass., for appellants.

Stephen A. Hopkins, Boston, Mass., with whom Sherburne, Powers & Needham, Boston, Mass., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

Plaintiffs, Newton and Scroggins, owners of a large dairy farm in Northfield, Massachusetts, purchased an automatic milking system from a firm named Goldstein & Gurwitz in nearby Ware, Massachusetts. This firm is an authorized dealer for James Mfg. Co., the manufacturer and a division of the defendant corporation.[1] The system was installed at plaintiffs' farm by one Ebner, a field representative of the manufacturer.[2] Plaintiffs allege that defendant negligently installed the system as a result of which their cows developed a disease known as mastitis [3]—to plaintiffs' great damage. They also contend that this negligent installation constituted a breach of implied warranty which arose out of an oral contract with defendant for the proper installation of the system.

The case was tried to the district court sitting without a jury. After both sides had put in their case, the court found that plaintiffs had failed to prove that the defendant was negligent in the installation of the milking system in question, and further, that plaintiffs did not show any privity of contract with the defendant upon which an implied warranty could be founded. Thereupon it dismissed the complaint and entered judgment for the defendant.[4] This appeal followed.

The essential facts are not in dispute. In August 1961 these plaintiffs, who had a herd of some 250 cows, were in the market for an automatic milking system. About that time Ebner, together with a salesman for Goldstein & Gurwitz, visited plaintiffs' farm for the purpose of selling them the "Jamesway" automatic milking system. After discussing this system in some detail and examining pictures and sale literature, plaintiffs entered into a written installment contract with Gold-

---

1. James Mfg. Co. makes, among other things, a complete line of barn and milking equipment sold under the name of "Jamesway", and merchandises this equipment exclusively through authorized dealers.

2. It is not customary for James to install the equipment it manufactures—usually leaving this to the dealers to and through whom it sells its equipment. The record is silent as to why or in what capacity Ebner was acting in making this installation—which extended from September 1961 to the beginning of November of that year. Goldstein & Gurwitz spent sometime helping with the installation.

3. Generally speaking, this is an infection of a cow's udder. It may be chronic or acute and is highly contagious. A high percentage of all cows carry chronic mastitis and in the absence of udder irritation are not seriously affected by it. When there is excessive irritation the mastitis becomes acute and the quality as well as the quantity of the milk is drastically reduced. After a while the cow loses its value as a milk producer and is usually sold for beef. Plaintiffs claim that the irritation which was responsible for the mastitis here was caused by the malfunctioning of this milking system.

4. Newton v. Rockwood & Co., 261 F.Supp. 485 (D.Mass.1966).

stein & Gurwitz for the purchase of a "Jamesway" system.[5]

During the course of their discussions, Newton informed Ebner that he also desired to replace an aerator which had been condemned by the milk inspector. This is an apparatus used to cool the milk prior to storage. Ebner suggested that he talk to one Tompkins who represented a firm that manufactured so-called triple tube coolers. Ebner contacted Tompkins who then went to the farm and discussed the purchase of the cooler with Newton. In describing it, Tompkins told Newton, among other things, that the ring core in the cooler through which the milk passed had a diameter of ⅜″. Plaintiffs agreed to purchase it. The new cooler was billed to them, delivered to their farm in October 1961 and Ebner connected it to the automatic milking system. When delivered it was enclosed in a stainless steel welded casing and the ring core in question could not be measured without first breaking this casing and dismantling the entire cooler. There were no markings on the outside of the casing to indicate the size of the ring core. Newton relied upon what Tompkins had told him as to the size.

Plaintiffs began using the milking system in the latter part of November 1961, but from the very beginning it failed to milk the cows properly. The vacuum that moves the milk through the lines appeared to be inadequate, thus causing these lines to fill up, which in turn caused the teat cups to fall off the cows during the milking process. As a result, the cows were not milked clean and their udders were irritated. Between November 1961 and June 1962 several representatives of the defendant endeavored to remedy this situation.[6] While their efforts did improve the system to a certain extent, there still was difficulty in that it did not milk the cows completely and it became necessary to hand-strip them. At this point it should be mentioned that during this period plaintiff Newton, in response to inquiries made by at least three of these representatives as to the capacity of the new cooler, expressly told them that the ring core had a ⅜″ diameter.[7]

In the spring of 1962 Newton hired his own expert to examine the system and also told him that the cooler had a ⅜″ ring core. After a thorough inspection, this expert reported that he could find nothing wrong with the milking system and that it was "as good as could be expected." Newton still was dissatisfied and finally in June 1962 two representatives of James, with Newton's permission, dismantled the triple tube cooler. They discovered that the ring core was not ⅜″ in diameter as Newton had been led to believe and as he had led others to believe, but actually had a diameter of only ³/₁₆″. Thereupon, also with Newton's permission, they pulled out the center pipe. The cooler was then

5. This contract identified Goldstein & Gurwitz as the sellers and plaintiffs as the purchasers. It called for 20 Herringbone Milking Parlor Stalls, 6 Floor Drains, 1 Jamesway Milker—complete, and 4 Vacuum Door Controls, all new. Although the contract made no mention as to who was to install the system, Newton testified that the agreed price covered "the installation and complete job." This contract was immediately assigned to James Mfg. Co., to whom plaintiffs made the first installment payment, and was then discounted.

6. For example, Ebner changed the location of the milking jar and his successor, one Baker, substituted a larger vacuum pump. For a more detailed account of the visits made by these representatives, see the able opinion of the district court cited in footnote 4.

7. In one instance, when asked by one of these representatives whether he thought the cooler had anything to do with the problem, Newton, who was an experienced dairy farmer, said that it had the right capacity and that he could forget it. In another instance Newton told one of these representatives that the cooler did a "very good" job in cooling the milk.

reconnected and the system worked "reasonably well".[8] Also, the acute mastitis let up almost immediately and no new cases of it broke out.

These are the essential facts found by the trial court pursuant to Fed. R.Civ.P. 52. Under this rule these findings may not be set aside unless clearly erroneous. There appears to be no serious claim or showing that these findings are clearly erroneous and for that reason we need not pursue this question. Suffice it to say, however, that on this record, even if such claim were made, we could not say that the facts as found were clearly erroneous.

Plaintiffs' first contention is that in August 1961, when Ebner and the salesman for Goldstein & Gurwitz discussed the purchase of a "Jamesway" system with them, an oral contract came into existence under which the defendant, acting through its agent Ebner, agreed to properly install this system;[9] and that the defendant's implied warranty of fitness for the intended purpose, which arose under this oral contract, was breached by reason of the negligent installation of the system. In our opinion this contention has no merit. There is no evidence whatever to support the existence of an oral contract between these parties. All that the plaintiffs showed with reference to this point is that a conversation or conservations took place between plaintiff Newton and Ebner, the substance of which was not offered in evidence. There being no contract, obviously there can be no warranty, as claimed.

It is undisputed that Ebner installed both the automatic milking system and the cooler. Even though there was no contractual relationship between plaintiffs and defendant in connection with this installation, it is nevertheless true that Ebner was under an implicit duty to install a "suitable" system. See Barrett v. Builders' Patent Scaffolding, 311 Mass. 41, 40 N.E.2d 6 (1942). Thus, the essential basis for imposing liability, if any, on the defendant could only be on the ground of negligent installation on the part of Ebner.[10] Barrett, supra; Barabe v. Duhrkop Oven Co., 231 Mass. 466, 121 N.E. 415 (1919). But on this record there is no proof of any such negligent installation. The evidence shows that the only thing definitely wrong with the milking system, as installed by Ebner, was the fact that the diameter of the triple cooler ring core was only half of what plaintiffs believed it to be. There is no evidence to warrant a finding that defendant was chargeable with any knowledge of this discrepancy in the cooler capacity. Ebner and defendant's other representatives reasonably relied upon Newton's representation that the ring core was 3/8″. This is particularly true where the only way defendant's representatives could have determined the size of the inner core was to completely dismantle the cooler. Such a course of conduct would have been most impracticable. Moreover, we think Ebner had a right to rely, to the extent that he did, upon the care of the original manufacturer of the cooler, at least with respect to the type of discrepancy here involved. Cf. Pabon v. Hackensack Auto

---

8. In late June 1962 Newton wrote a letter to Ebner stating in pertinent part: "We have at last found the cause of all our trouble with the milking parlor. * * * They found the pipe was 3/16″ instead of 3/8th. I understood that this triple tube cooler had a 3/8″ space for ring of milk around the outside of the center pipe. Their measurement of 3/16″ is not near room enough for milk and proper vacuum. We took the center pipe out and it has eliminated our milker problem. If there had been a 3/8″ ring like I thought we would have had no trouble."

9. They seek to bolster this contention by pointing to the fact that they made the first payment on this system directly to James. But this lends little, if any, support to their position since the check was dated December 12, 1961, some three and a half months after these conversations and at that time the Goldstein & Gurwitz contract already had been assigned to James.

10. Assuming, of course, but not deciding, that Ebner was acting as defendant's agent in installing the milking system and cooler.

Sales, Inc., 63 N.J.Super. 476, 164 A.2d 773 (1960). In view of the above we need not consider the question of damages.

Affirmed.