**WHITE'S FARM DAIRY, INC.,**
Plaintiff, Appellant,

v.

**DE LAVAL SEPARATOR COMPANY,**
Defendant, Appellee.

No. 7530.

United States Court of Appeals,
First Circuit.

Oct. 16, 1970.

Talbot T. Tweedy, Taunton, Mass., with whom Edward A. Roster, was on the brief, for appellant.

Philip Goltz, Fall River, Mass., with whom Horvitz & Horvitz, Fall River, Mass., was on the brief, for appellee.

Bfore ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

Plaintiff, White's Farm Dairy, Inc., (White's), the owner and operator of a large dairy farm, brought this diversity action against the defendant, a manufacturer of milking equipment. Plaintiff claims that the defendant breached its warranties in selling defective milking equipment to the plaintiff and also that it was negligent in the manufacture of said equipment.[1] The case was tried to a jury. At the conclusion of plaintiff's evidence, the district court directed a verdict for the defendant on the grounds that no privity had been shown between the parties on the warranty counts; that the plaintiff had failed to prove negligent manufacture; and further, that the negligence count was barred by the statute of limitations. This appeal followed.

"In determining whether or not the evidence in a given case is sufficient to take the case to the jury over a motion for a directed verdict, the evidence must be viewed in the light most favorable to the plaintiff, giving the plaintiff the benefit of every inference favorable to him which may be fairly drawn. It is not for the court to weigh the conflicting evidence or to judge the credibility of witnesses. Whenever the evidence is such that fair-minded men may draw different inferences therefrom, and reasonably disagree as to what the verdict should be, the matter is one for the jury." M. C. Carlisle & Co. v. Cross, 386 F.2d 672, 674–675 (1st Cir. 1967). With this in mind we shall review and summarize the evidence.

In 1964 the plaintiff corporation, which operated several dairy farms in Acushnet, Massachusetts, and nearby towns, decided to consolidate its operations into one central farm. Among other things, plans and specifications were prepared for a double milking parlor, so-called, at the central farm where the cows would be led twice a day to be milked by machine. In the summer

---

1. A further count alleging misrepresentation was waived by plaintiff.

of that year plaintiff wrote to several manufacturers of milking equipment, among them the defendant, enclosing specifications for the equipment required and requesting bids. The defendant replied that it was referring the request to its sales representative, one Vaughan "who will place it in the hands of the nearest De Laval dealer and guide him in working up a complete quotation." Vaughan lost no time in visiting James White, plaintiff's vice president.[2]

James reviewed the plans for the new farm with Vaughan. A week later, Vaughan sent him a letter listing "some of our De Laval users that might be of some help in planning your new milking system."[3] Vaughan also visited the farm at least once a month for the next five months to talk to the Whites about the new equipment to be purchased. In November, Cliff Brown, president, treasurer and manager of the Ben Brown Co., a De Laval dealer, went to the White farm with Vaughan. James White testified that he had never met Brown before nor had plaintiff ever done business with Brown's company. This was corroborated by his father, Raymond, and by Brown himself. Brown testified that he visited the farm about six times before he signed the contract. Sometime in December 1964 the Whites and Vaughan agreed on the equipment to be purchased and the price to be paid.

After some discussion, Vaughan suggested three dealers, including the Ben Brown Co., through whom this equipment could be obtained but stated that the plaintiff should buy from Brown as this was the bigger concern and "was the only one who was going to be in business for any length of time and could give us better service." In addition, Vaughan also told Raymond White "that if I went along with Mr. Brown we could get a 15 per cent discount" on the new equipment.

The contract was signed between Brown and plaintiff on January 18, 1965. Plaintiff arranged for payment to Brown by a series of notes. Vaughan was not present at the signing, but Brown told Raymond White that "he had talked to Mr. Vaughan and he had everything worked out; that Mr. Vaughan had furnished him with a layout and lists of material and figured out the price and they had agreed on a 15 per cent discount, and everything was all agreed." Raymond White testified that he had not discussed the discount with Brown at all, but only with Vaughan and that this was in the first part of January, about two weeks before he talked to Brown. Raymond also testified that when he and Brown signed the contract, there was no discussion about the discount or the equipment being sold, because all the terms had been prepared and agreed upon ahead of time by White's and Vaughan. There was evidently discussion between Vaughan and Brown about which De Laval dealer would "do the job the way De Laval wanted it done." Brown testified that Vaughan thought Brown "should give them [White's] a 15 per cent discount in order to get the job." As part of the inducement to Brown to take the job, Vaughan agreed to supervise and help with the installation.[4] As early as November 14, 1964, Vaughan had advised James White by letter that "everything

---

2. Plaintiff was a family corporation, so-called, in which James' father, Raymond White, was president and treasurer, and another son, David, was clerk.

3. In November he sent a similar letter listing other users.

4. The witness [Brown]: We thought that this was—I thought this was a very complicated job, bigger than anything we had done before.
   Q. This is what you told Mr. Vaughan?
   A. Right.
   Q. What did he say to you?
   A. And that in order to be sure it was properly installed, I wanted his help in the installation, regarding supervision and help.
   Q. What else did he say?
   A. He and Mr. Meagher agreed that they would help on the job.
   The Court: With the installation?
   The witness: In the installation, yes.

will be done under direct factory supervision."

The Whites consistently denied that they knew that they were dealing with Brown as an entity independent from De Laval. James White testified that Brown became the seller because "he was brought in by De Laval Company." He also said that Brown was "just an in-between man. He didn't dare open his mouth."

In January 1965 before plaintiff bought the equipment, Raymond White arranged with Vaughan, not Brown, as to the time for its installation. Except for the smaller items, all of the equipment was delivered directly by De Laval. It was installed by Vaughan, another of De Laval's men named Meagher, Brown, and two of Brown's employees. When it was ready, Vaughan held a class for White's employees on the operation of the new equipment. Milking with the new equipment began during the first week of April 1965. But from the start, something was wrong. The cows were uneasy and nervous when the new equipment was used on them. The Whites immediately complained, mostly to Vaughan. Vaughan stayed three days at the farm. He suggested that White's men and animals were unfamiliar with the new equipment and had to get used to it. But milk production declined rapidly, and there was abundant evidence that the cows had contracted mastitis.

De Laval sent several experts to the farm to try and discover the cause of the trouble. From the very first day the new equipment was used the Whites complained continuously to Vaughan and even the complaints they occasionally made to Brown were referred to Vaughan or Meagher. There was evidence that between April and the first of May 1965, James White complained to Vaughan and Meagher possibly eight or ten times and from April 1 through August 1965 he complained to De Laval directly "probably 30" times. James White testified that complaints were made to Vaughan because "[t]his is the man I did business with, Joe Vaughan."

In Massachusetts it is well settled that lack of privity is an absolute defense to an action for breach of warranty. Haley v. Allied Chemical Corp., 353 Mass. 325, 331, 231 N.E.2d 549, 553 (1967). But on the above facts, we think the jury could have reasonably found that Brown was acting as the agent for De Laval and that there was in fact privity between White's and De Laval even though Brown was the actual signatory of the contract.

Initially, defendant argues that the agency theory was neither pleaded nor proved in the district court. It is true that it was not pleaded. However, the general rule is that in actions against a principal, there is no necessity of pleading that the agreement was executed through an agent. Independence Indemnity Co. v. Grants Pass & Josephine Bank, 29 F.2d 83, 85 (9th Cir. 1928); Annotation, 89 A.L.R. 895 (1934). This point was raised in argument in the district court and it is properly here on appeal.

In Massachusetts the proof of agency is held to be ordinarily a question of fact for the jury. Stern v. Lieberman, 307 Mass. 77, 29 N.E.2d 839 (1940); Becker v. Hadley, 248 Mass. 104, 142 N.E. 747 (1924). It is to be determined from all the evidence and reasonable inferences to be drawn therefrom. Bradley v. Meltzer, 245 Mass. 41, 139 N.E. 431 (1923). The case of Raymond Syndicate, Inc. v. American Radio and Research Corp., 263 Mass. 147, 160 N.E. 821 (1928) is quite close to the instant one. There it was held that "submission of bills for the goods by and in the name of [the dealer] did not preclude the plaintiff from showing that the sale was in fact made by the defendant." 263 Mass. 147, 152, 160 N.E. 821, 823. The negotiations for sale were conducted both with the manufacturer's sales representative and the agent of Radio Supply Corporation, in whose name the deal was made. The invoice was in the name of Radio Supply as were the checks given by plaintiff. But the evidence showed that plaintiff

and defendant's representatives agreed upon the price of the sets sold, upon which conflicting evidence the jury was allowed to decide the case.

In the instant case the manufacturer's warranty stated "Any claims for equipment replacement should be taken up with the installing dealer or *agent,* if any, otherwise with the Company direct." (Emphasis added). Taken with all the other circumstances, the Whites, reading this, could have inferred that in some instances there was no dealer involved and in others that the dealer was an "installing agent."

Defendant relies on our opinion in Newton v. Rockwood & Co., 378 F.2d 315 (1st Cir. 1967). That case has certain similarities, but they are purely superficial. Although agency was pleaded, the case was argued in the district court, 261 F.Supp. 485 (D.Mass.1966), and on appeal as a question of oral contract between the parties with no agency involved. The conversation which was alleged to be the oral contract was not in evidence and we held that "there being no contract, obviously there can be no warranty, as claimed." 378 F.2d 315, 318. Here, however, there was clearly sufficient evidence for a jury to find that Brown was a stand-in for De Laval.

During the oral argument defendant contended that this case is similar to one where a consumer purchases a car from a dealer. We disagree. The jury could believe that plaintiff did not approach Brown in any way; that all the information about the equipment, its pricing, installation, and operation came through Vaughan; that Brown did not even discuss the prices or the discount with the Whites, but submitted a sales document actually created by Vaughan. In these circumstances, even if the jury believed that Brown was ordinarily an independent entity, it could find that in this case the manufacturer itself was in fact handling the deal. We therefore conclude that the trial court erred in directing a verdict for the defendant on the warranty counts.

■ We turn briefly to the statute of limitations issue raised in connection with the negligence count. The Massachusetts statute for a cause of action in negligence is two years from the date the cause of action accrues. Mass.Gen. Laws ch. 260, § 2A (1959). The earliest date upon which plaintiff can rely here is May 12, 1967, the date of its writ. It is undisputed that the installation was completed during the first week of April 1965 and that the initial milking with defendant's equipment took place during that week. It is also undisputed that plaintiff complained to the defendant *immediately* that the equipment was defective. In view of this evidence, we think the cause of action accrued during the first week of April 1965 and the statute of limitations had already run on the date of plaintiff's writ.[5]

Plaintiff argues that this was a case of "continuing tort," and that the cause of action did not accrue until late September 1965 when plaintiff learned the source of the injury to its cows and the extent of the damage. This goes far beyond the Massachusetts cases. In Massachusetts the "continuing tort" theory has apparently been confined to instances of nuisance or trespass. *See* Sixty-Eight Devonshire, Inc. v. Shapiro, 348 Mass. 177, 202 N.E.2d 811 (1964); Wells v. New Haven & Northampton Co., 151 Mass. 46, 23 N.E. 724 (1890). The reasoning in Capucci v. Barone, 266 Mass. 578, 165 N.E. 653 (1929), has been reiterated in Pasquale v. Chandler, 350 Mass. 450, 215 N.E.2d 319 (1966), and we think that this adequately demonstrates Massachusetts' reluctance to extend the theory further.

Accordingly, the judgment of the district court is reversed as to the three counts for breach of warranty and affirmed as to the negligence count.

5. The record also shows that the writ was not delivered to the sheriff's office for service until June 29, 1967.