Nashua District Court
No. 92-459

ROBERT DALTON

v.

STANLEY SOLAR & STOVE, INC.

July 27, 1993

*Robert Dalton, pro se,* filed no brief.

*Sylvia Mary Brennan,* of Arlington, Virginia, and *Stanley J. Kuzia,* of Manchester (*Mr. Kuzia* on the brief, and *Ms. Brennan* orally), for the defendant.

HORTON, J. The plaintiff, Robert Dalton, filed suit to recover the cost of a wood stove distributed by the defendant, Stanley Solar & Stove, Inc., and purchased from a dealer licensed by the defendant. The Nashua District Court (*Howorth,* C.J.) found the defendant liable for breach of warranty and awarded judgment for the plaintiff. On appeal, the defendant contends that the district court grounded its decision on breach of an implied warranty of fitness, RSA 382-A:2-315 (1961), and that this theory was inapplicable because the defendant did not participate in the stove's sale. We reverse.

In October 1991, the plaintiff purchased an Osburne wood stove from Dan Pelletier, the owner of The Country Stove Shop in Hudson. The plaintiff bought the stove to heat his residence, which consisted of an 840-square foot mobile home and an attached porch containing an additional 300 square feet. The Osburne stove did not adequately heat the plaintiff's home, and in December 1991, the plaintiff returned to The Country Stove Shop and explained the problem to Pelletier. Upon Pelletier's recommendation, the plaintiff exchanged the Osburne for an Englander wood stove. The Country Stove Shop carried the Englander pursuant to a license agreement with the defendant, the stove's distributor. The Englander's operational literature specified that the stove was designed to heat a maximum of 1,000 square feet, an area 140 square feet smaller than the plaintiff's residence. It also had special air intake and chimney draft requirements, neither of which were met when Pelletier and the plaintiff installed the stove. Not surprisingly, the Englander, like the Osburne, did not effectively heat the plaintiff's residence. After Pelletier tried unsuccessfully to correct the problem, he sought help from the defendant. When the defendant's president, Stanley J.

Kuzia, examined the stove, he did not indicate that the size of the plaintiff's residence exceeded the Englander's heating capacity, or that a special air intake system had not been installed. Kuzia corrected a mechanical problem with the Englander's damper, however, and the chimney was extended at his suggestion.

The stove initially functioned properly following Kuzia's repairs. After a few days, however, the plaintiff again experienced problems heating his residence. By that time, the relationship between Kuzia and Pelletier had deteriorated, apparently as a result of Kuzia's dissatisfaction with Pelletier's performance as a dealer, and Pelletier's dissatisfaction with the quality of the Englander stove. The plaintiff opted to sue the defendant, rather than Pelletier, to recover the cost of the stove. The district court held the defendant liable for breach of warranty. It premised the defendant's liability on its "duty to the customer to ensure proper performance by the dealer," its attempt to repair the stove, and its failure to either repair the stove or recognize that the stove lacked the capacity to heat the plaintiff's residence. While holding for the plaintiff, the court found it "peculiar" that the plaintiff had sued the stove's distributor rather than its dealer. Dan Pelletier, the court noted, "must bear most of the responsibility for not discouraging plaintiff from buying a stove which was too small, for not insisting that there be an air intake system, and for not checking the flue draft after the unit was installed." Accordingly, the court ordered rescission of the sale of the Englander, and directed that $824, representing the cost of the stove, be paid "jointly by defendant and Mr. Pelletier as they may agree." If the defendant and Pelletier could not agree, the defendant was to pay the judgment. The defendant could then sue Pelletier "for breach of the distributorship agreement for his failure to ensure the proper capacity of the unit prior to sale, and for his failure properly to follow stove installation and operations checking practices in accordance with the standards of the stove industry."

█ While the district court did not specify the particular warranty theory underlying its decision, we find that the court relied on breach of warranty of fitness for a particular purpose, RSA 382-A:2-315 (1961). This statute, which codifies section 2-315 of the Uniform Commercial Code (UCC), provides:

> "Where the seller at the time of contracting has reason to know of any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless

excluded or modified . . . an implied warranty that the goods shall be fit for such purpose."

An implied warranty of fitness, like an implied warranty of merchantability, *see* RSA 382-A:2-314 (1961), does not arise out of an agreement between the seller and buyer. Rather, it is "imposed by law on the basis of public policy." *Elliott v. Lachance*, 109 N.H. 481, 483, 256 A.2d 153, 155 (1969).

The language and substance of the district court's written order correspond with RSA 382-A:2-315 (1961). The "main problem" in regard to the Englander, the district court found, was the stove's lack of capacity to heat the plaintiff's residence, and "the failure of Mr. Pelletier as dealer to explain this to [the plaintiff]." Although "operating and installation problems" had occurred, the district court based its decision "principally on the fact that the stove [was] found not to have adequate capacity to heat the home even if all operating features of the stove were functioning properly." In other words, the stove, if appropriate for ordinary purposes, was not fit for the "particular purpose," *see* RSA 382-A:2-315 (1961), required by the plaintiff and made known to Pelletier.

As a distributor that was not involved in the Englander's sale, the defendant contends that it cannot be held liable for breach of an implied warranty of fitness. According to the defendant, this theory of contractual liability would apply only if there was vertical privity between the plaintiff and the defendant. The term vertical privity describes the relationship between adjoining parties in a marketing chain. *See* W. HAWKLAND, 1 UNIFORM COMMERCIAL CODE SERIES § 2-318:01, at 421 (1984). Vertical privity exists, for example, between a wholesaler and retailer, and between a retailer and the ultimate buyer, but not between a wholesaler and the ultimate buyer. *Id.* Vertical privity is readily distinguishable from horizontal privity, which denotes the relationship between the retailer and one who uses or consumes the goods. Where a dealer sells goods to a buyer, and a third party is injured due to a defect in the goods, whether the third party can sue the dealer is an issue of horizontal privity. *Id.*

■ With the enactment of RSA 382-A:2-318 (Supp. 1992), the New Hampshire Legislature removed both horizontal and vertical privity as defenses to implied warranty claims. *See Lempke v. Dagenais*, 130 N.H. 782, 788, 547 A.2d 290, 294 (1988). The statute, which is the substantive equivalent of Alternative C of the Official Text of UCC § 2–318, *see id.*; HAWKLAND, *supra* § 2–318, at 415, provides:

"Lack of privity shall not be a defense in any action brought against the manufacturer, seller or supplier of goods to recover damages for breach of warranty, express or implied, . . . if the plaintiff was a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods."

RSA 382-A:2-318 (Supp. 1992).

While the defendant cannot invoke vertical privity as a defense to the plaintiff's claim, we nonetheless find that the district court erred in holding the defendant liable for breach of an implied warranty of fitness. By its terms, RSA 382-A:2-315 (1961) applies only if, at the time of sale, a seller knows or has reason to know of the particular purpose for which the goods are required, and that the buyer is relying on the seller's skill or judgment. *See Brescia v. Great Road Realty Trust*, 117 N.H. 154, 158, 373 A.2d 1310, 1312 (1977); R. ANDERSON, 3 UNIFORM COMMERCIAL CODE § 2–315:16, at 294 (3d ed. 1983). In this regard, the warranty does not provide a "warranty of continuing serviceability." ANDERSON, *supra* § 2–315:16, at 294. Here, the record reveals that Dan Pelletier, acting independently of the defendant, sold and delivered the Englander to the plaintiff. The defendant could not have known of the plaintiff's particular purpose for the Englander, or of Pelletier's representations that the stove could properly heat the plaintiff's residence. Nor is there evidence that the defendant represented to Pelletier or any other party that the Englander could heat an area the size of the plaintiff's home. To the contrary, literature distributed with the Englander explained the stove's heating capacity. Under these circumstances, the defendant could not be liable for breach of an implied warranty of fitness.

We further find that the defendant did not become subject to liability for breach of an implied warranty of fitness by virtue of Kuzia's attempts to repair the Englander after the plaintiff had purchased the stove. Kuzia's repair efforts did not alter the fact that the defendant was not a party to the stove's sale, and that at the time of the sale did not know of either the plaintiff's particular heating needs or Pelletier's representations concerning the stove's heating capacity. *See Newton v. Rockwood & Co.*, 378 F.2d 315, 318 (1st Cir. 1967).

*Reversed.*

All concurred.