TRANS NATIONAL COMMUNICATIONS, INC., Plaintiff,

v.

OVERLOOKED OPINIONS, INC., Defendant.

Civ. A. No. 94–10382–NG.

United States District Court, D. Massachusetts.

Nov. 4, 1994.

Lee H. Glickenhaus, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Trans Nat. Communications, Inc.

David A. Hoffman, Michael Vhay, Hill & Barlow, Boston, MA, for Overlooked Opinions, Inc.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

## I. FACTS

This case involves the breakdown of a contractual relationship between Transnational Communications, Inc. (TNC), a reseller of long distance services, and Overlooked Opinions, Inc. (OOI), a marketing firm specializing in the gay and lesbian market. Since the subject of the contract was the provision of long distance services, the case also involves complex and novel interpretations of FCC regulations in the post AT & T breakup world.

Before me is Plaintiff Trans National Communications, Inc. ("TNC")'s Motion for Partial Summary Judgment. For the reasons stated below, that motion is **DENIED**.

### A. The TNC—OOI Contract

Taking all of the defendants' evidence as true, and making all inferences in its favor, *Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992), a jury could find the following: TNC is a "switchless reseller" of long-distance telephone service. Its business involves buying large amounts of long-distance time from an underlying carrier (in this case Sprint Communications Co.), and reselling that time to consumers. Defendant OOI is a market research and marketing firm which identifies itself as "gay and lesbian owned and operated" and specializes in the gay and lesbian market. On November 5, 1992, TNC and OOI entered into a joint venture to provide a specialized long-distance telephone service, focussing on gay and lesbi-

an consumers, and operating under the name "CommunitySpirit."[1]

Under the terms of their contract ("the CommunitySpirit contract") OOI agreed to recruit consumers to sign up for CommunitySpirit long distance service. OOI was responsible for all costs associated with this recruitment. Once OOI obtained a written commitment from a customer to use CommunitySpirit long-distance, the customer's name and other particulars were turned over to TNC, which would actually provide the long distance service, and which would insure that calls made from the customer's telephone were routed through TNC's underlying carrier.

In order to accomplish this last step, TNC had to insure that each customer's Local Exchange Carrier ("LEC")[2] was advised that the customer had chosen TNC as its Primary Interexchange Carrier ("PIC").[3] TNC would then advise Sprint, its underlying carrier, of the requested change in the primary carrier and Sprint, whose lines were directly connected to the LECs' switching hardware, would request the appropriate local carrier to make the change.[4] *See In the Matter of Policies and Rules Concerning Changing Long Distance Carriers (Petitions For Reconsideration and Clarification)*, 8 F.C.C.Reg. 3215 (1993) (hereinafter *"Changing Long Distance Carriers (Reconsideration and Clarification)"*) ¶¶ 20–25.

Once a customer signed up with CommunitySpirit, OOI had no further obligations to service him or her under the contract. All billing and customer service functions were handled by TNC, which was permitted by the CommunitySpirit contract to use the CommunitySpirit and Overlooked Opinions service marks for this purpose. OOI was, however, entitled to a royalty based on the number of customers it recruited, and their total amount of long-distance usage. A portion of OOI's royalty was to be contributed to Gay/Lesbian related causes.

CommunitySpirit commenced operations in November, 1992, and eventually obtained approximately 20,000 subscribers. OOI advertised the CommunitySpirit service in national publications and at gay and lesbian events. While all of OOI's promotional material contained a form authorizing a change in the customer's long distance service, the wording on these forms was not uniform. OOI solicited at least 5 different types of authorizations from prospective CommunitySpirit customers. Some of the authorizations named "Members' Long Distance Advantage Program" as the customer's long distance service. Members' Long Distance Advantage Program ("MLDA") is a service mark of TNC. Another group of authorizations named "CommunitySpirit—MLDA" as the carrier, while a third group named only "CommunitySpirit". None of the advertising, however, mentioned TNC by name, and none explained that TNC (or any entity other than OOI), was the entity through which long-distance services were being provided to CommunitySpirit customers.

**B. The TNC—OOI Dispute**

In April, 1993, a dispute arose between TNC and OOI, concerning the quality of service which TNC was providing to CommunitySpirit customers. OOI alleged that TNC was violating the terms of the contract by failing to provide an appropriate type of calling-card service, by failing to provide generally acceptable levels of service in other areas, by misbilling customers, and by failing

1. CommunitySpirit is a registered service mark of OOI.

2. LECs are the telephone companies which provide the physical connection between a subscriber's telephone and the local switching office. These companies provide local telephone service and connect customers to Interexchange Carriers ("IXCs") for handling long-distance calls.

3. The PIC is the default long distance carrier for a particular telephone. Calls are routed through this carrier unless the customer requests otherwise (by dialing a special access number for example.) A PIC could be either a switchless reseller like TNC, or a "facilities based" long distance carrier, like Sprint or MCI.

4. Although I am reluctant to do so, I will occasionally refer to these various entities (LEC's, IXC's, PIC's) by their abbreviations (as well as generally) because the regulations refer to them in that fashion. I will also refer to them as local phone companies, long distance carriers, and principal long distance carriers, respectively.

to comply with certain other billing and reporting requirements contained in the contract. The parties attempted to settle their dispute over the next few months, but were unsuccessful. By letter dated February 17, 1994, OOI purported to terminate the CommunitySpirit contract under a clause permitting it to do so in the event of unapproved changes in the level of TNC's service.

Following OOI's purported termination of the agreement, the parties scrambled to retain the business of the customers they had formerly, in effect, shared ("the disputed customers"). TNC commenced a direct marketing campaign for customers, which bypassed OOI, but which wrongly continued to use both the "Overlooked Opinions" and "CommunitySpirit" service marks.[5] TNC subsequently launched the "Pride Network" which provided a similar service to that which had been offered by CommunitySpirit. In its promotional literature, TNC stated that it was "taking over all aspects of the [CommunitySpirit] program and relaunching it as *The Pride Network*" because OOI had failed to make promised charitable contributions on behalf of CommunitySpirit customers.

OOI also took steps to protect its position. Some time after February 17, 1994, it contacted Sprint, TNC's underlying long-distance carrier, and informed it that OOI had chosen a company called AmeriConnect to be its new switchless reseller. Because Sprint was also the underlying carrier for AmeriConnect, it was able to, and in fact did, switch all disputed customers from TNC to AmeriConnect without the need to contact any customer's local phone company. Shortly thereafter, TNC prevailed upon Sprint to switch all of those customers back to TNC. OOI also solicited, after February 17, 1994, approximately 5,000 authorizations by which customers purported to select CommunitySpirit as their long distance service and specifically rejected any association with TNC.

TNC filed this action on February 24, 1994, alleging various contractual breaches, business torts, false advertising and defamation. OOI counterclaimed for breach of contract, false advertising, service mark infringement, libel, and various business torts.

Before the Court is TNC's Motion for Partial Summary Judgment. TNC seeks a ruling solely to determine the question of which party has the right to provide long-distance telephone service to the disputed customers as of February 17, 1994, the date of OOI's purported termination of the parties' contract. TNC claims it has this right, as a matter of FCC law, regardless of how the court decides any of the other issues in this dispute.

For the reasons stated below, TNC's Motion for Partial Summary Judgment is **DENIED.**

## II. *REGULATORY FRAMEWORK*

The issue presented by this motion appears to be one of first impression. It arises out of a type of business relationship which was only made possible by recent changes in the structure of the long-distance telephone system. It was not until 1976 that FCC regulations permitted the resale of telephone services by switchless resellers such as TNC. *See Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities,* 60 F.C.C.2d 261 (1976) (hereinafter *"Resale and Shared Use"*), *aff'd sub nom AT & T v. FCC,* 572 F.2d 17 (2d Cir. 1978). Under that ruling, the FCC held that "an entity engaged in the resale of communications services is a common carrier, and is fully subject to the provisions of Title II of the Communications Act [of 1934]." *Id.* at ¶ 8. Accordingly, all such resellers, like primary long-distance carriers, are required to file and maintain tariffs with the FCC. 47 U.S.C. § 203. Resellers are also required to comply with those sections of the Act requiring non-discriminatory access to their services. *See* 47 U.S.C. § 201, 202.

More significantly, it was not until 1985, in the aftermath of the breakup of AT & T, that telephone customers were given the option of choosing a company *other* than AT & T to be their principal long-distance carrier. *See generally U.S. v. AT & T,* 552 F.Supp. 131 (D.D.C.1982) *aff'd sub nom Maryland v. U.S.,* 460 U.S. 1001, 103 S.Ct. 1240, 75

---

**5.** This was the subject of OOI's motion for a preliminary injunction, granted on July 8, 1994.

L.Ed.2d 472 (1983). Under the terms of the modified final judgment in *U.S. v. AT & T* ("the modified final judgment"), local telephone companies (i.e., LEC's) were required to develop a mechanism for local phone customers to choose long distance carriers other than AT & T to be their "primary interexchange carrier" ("PIC"), that is, the carrier that would provide long-distance service on calls directly dialed from the customer's telephone. *See U.S. v. Western Electric Co.*, 578 F.Supp. 668, 670 (D.D.C.1983).

In order to implement the provisions of the modified final judgment, the FCC, in *Investigation of Access and Divestiture Related Tariffs*, 101 F.C.C.2d 911 (1985) (hereinafter *"Investigation of Access"*), issued rules for providing telephone customers with equal access to long-distance telephone carriers. These rules required, as an initial step, that local phone companies issue to all customers a "ballot" permitting them to choose a primary long distance carrier (a "PIC" in FCC jargon) without charge. *See id.*, at Appendix B, ¶ 4. Thereafter, any long distance carrier[6] could solicit an authorization from a customer designating it as the customer's primary carrier. Once such a commitment was obtained by a long distance carrier, the carrier would notify the local telephone company (LEC) of the change, and the LEC would be required to program its circuits to route the customers' calls to the chosen carrier. *See Id.*, at Appendix B, ¶ 10. Local phone companies were permitted to charge a fee for these subsequent switches. *See Id.*, at Appendix B, ¶ 10.3.

The initial FCC-mandated procedure required that a long distance carrier obtain a written "Letter of Agency" (LOA) from a customer before notifying a local carrier that it had been selected as the customer's primary carrier (PIC). *See id.* at Appendix B, ¶ 11. The LOA would authorize the long-distance carrier to provide long-distance service to the customer, and to act on the customer's behalf in submitting a change order to the customer's local telephone company, requesting that it implement the change.[7]

After complaints by some local phone companies that this process was too burdensome, the FCC changed its rules to permit long distance carriers to submit PIC change orders if they had "instituted steps to obtain signed LOAs", even before they had them in hand. *In the Matter of Investigation of Access and Divestiture Related Tariffs (Allocation Plan Waivers and Tariffs)*, 101 F.C.C.2d 935 (1985) (hereinafter *"Investigation of Access (Waivers)"*) at ¶ 21(1).

Although one result of this new regime was heightened competition between AT & T and its new rivals, there were also significant problems. In 1987, the Illinois Citizens Utilities Board ("ICUB") in its petition for changes in the FCC rules, *see In the Matter of Illinois Citizens Utility Board Petition for Rule Making*, 2 FCC Rcd. 1726 (1987) (hereinafter *"ICUB Petition"*), reported that long distance carriers, either as a result of a customer request for information or a telemarketing contact with the customer, would often switch a customer's PIC without her permission. Such unauthorized PIC switching is known in the industry as "slamming." According to the ICUB, consumers would often end up paying out of pocket for the cost of switching back to their previous PIC. The FCC, however, declined to act on the ICUB Petition.

The issue of "slamming" was revisited by the FCC in 1991. At this time, AT & T, which had previously opposed tighter regulation of PIC change procedures, reversed its position and requested that the FCC reinstate its original policy of requiring long distance carriers to obtain a written Letter of Agency *before* submitting a PIC change order to a local carrier. *See In the Matter of American Telephone and Telegraph Co. Petition for Rule Making*, 6 FCC Rcd. 1689 (1991) (hereinafter *"AT & T Petition"*). AT & T accused its competitors (and in particular MCI) of using misleading telemarketing techniques to obtain the names of customers, who would then have their PICs switched

---

**6.** A long distance carrier could either be a "Facilities based carrier" such as MCI or Sprint, or a "switchless reseller" such as TNC.

**7.** The Letter was also required to contain information disclosing to the customer the possibility of an LEC-imposed fee associated with the change. *See id.* at Appendix B, ¶ 10.

without authorization. AT & T claimed that a survey showed that 10–15 percent of its customers who had been switched during a period in 1989 had not authorized the change. *AT & T Petition* at ¶ 9.

After receiving comments from interested parties, the FCC acted in 1992 by issuing a formal regulation specifically addressing the telemarketing activities of long distance carriers. *See In the Matter of Policies and Rules Concerning Changing Long Distance Carriers,* 7 F.C.C.Reg. 1038 (1992) (hereinafter *"Changing Long Distance Carriers"*) at ¶¶ 3–4; 47 C.F.R. § 64.1100. Under the new regulation, long distance carriers were permitted to use one of four methods to obtain customer authorization, through telemarketing, to switch primary carriers: (1) they could solicit Letters of Agency, as under the FCC's original rule, but could not submit change orders until the LOAs were in hand; (2) they could provide toll-free "800" numbers where customers could call to request that their primary carrier be switched; (3) they could solicit oral change authorizations, which would then have to be confirmed by an independent third party; or (4) they could solicit oral change orders, send written confirmation materials to the customer, and then wait 14 days before submitting a PIC change order to the local phone company. 47 C.F.R. § 64.1100.

Although the FCC's rule with respect to PIC selection purported to apply to all long distance carriers, it was impossible for one class of carrier, namely switchless resellers such as TNC, to comply with its literal requirements. Because switchless resellers own no transmission equipment of their own, they cannot simply submit a request to a local phone company to connect a customer to their lines, no matter what the form of that request. Rather, they must refer all customer requests to their underlying carrier (i.e., AT & T, Sprint or MCI), which, in turn, must request the connection from the local company. *See Changing Long Distance Carriers (Reconsideration and Clarification),* 8 F.C.C.Reg. 3215 (1993), ¶¶ 20–25. Accordingly, switchless resellers adopted a modified procedure whereby a reseller would solicit a Letter of Agency in favor of its underlying

facilities based carrier (e.g. Sprint) which would, on that authority, submit the customer's request to the appropriate LEC. The reseller would, in turn, execute Letters of Agency in favor of the underlying carrier (e.g., Sprint) which would, on that authority, submit names of customers to be switched to the relevant LECs. This procedure has been approved by the FCC as complying with the requirements of 47 CFR § 64.1100. *Id.*

### III. *ANALYSIS*

■ TNC seeks "a determination that it, rather than Overlooked [Opinions], has the right to provide long-distance service to the accounts in dispute." (TNC Motion for Partial Summary Judgment at 2).

TNC's argument is based on the regulatory framework which apparently gives it the status as a common carrier that OOI did not have and legally could not have had. TNC claims that the FCC's regulations permit only switchless resellers, like itself, or long distance carriers, like Sprint, MCI or AT & T, to effect changes in a customer's primary long distance carrier (PIC). According to TNC, if there was to be a change in a customer's primary long distance carrier (PIC), such change could only be accomplished after the customer had executed a Letter of Agency solicited by the new carrier. Since OOI was not a long distance carrier, TNC contends, Letters of Agency naming OOI (or one of its service marks) as a customer's carrier had no legal effect. "Accordingly, TNC argues that none of the Letters of Agency solicited from CommunitySpirit customers gave OOI legal authority to switch any customer's primary carrier. Since the Letters of Agency executed prior to February 17, 1994 (the date of the TNC–OOI breakup) authorized TNC to provide long distance service, TNC contends that they could not have authorized OOI to select a different primary carrier later on. Since the Letters of Agency obtained after February 17, 1994 only name 'CommunitySpirit', TNC asserts that they are invalid, since they do not name an actual long distance carrier as the customer's chosen PIC."

TNC's argument rests on two subsidiary claims. First, as a matter of law, TNC argues, FCC regulations cover the field, and regulate all the ways in which primary carrier changes can be implemented—by switchless resellers or the carriers themselves, and through Letters of Agency or some variant of them, specifically authorized by the FCC. Since OOI is not included in the regulatory scheme, it is either 1) unlawfully attempting to provide long distance service on its own, or 2) acting in an agency capacity not authorized by the FCC rules.

Second, TNC claims that even if OOI could act as an agent of the customers to implement changes in the PIC, no customer in fact authorized it to submit a change over from TNC to AmeriConnect.

### A. Whether OOI's Activities Constituted the Unauthorized Provision of Long Distance Telephone Service

TNC argues that OOI could not offer or resell long-distance telephone service because it has not filed common-carrier tariffs with the FCC. *See AT & T v. FCC,* 572 F.2d at 24–25. Thus, TNC argues, to the extent that OOI solicited Letters of Agency from customers by purporting to be offering long-distance service in its own right, those Letters of Agency are legally ineffective.

> "A common carrier is one which undertakes indifferently to provide communications service to the public for hire, regardless of the actual ownership or operation of the facilities involved."

*AT & T v. FCC,* 572 F.2d at 24.

The key words here are "for hire," which suggest that a common carrier is selling something which it has, namely access to the communications service in question. This definition includes the resale of long-distance phone service, *id.,* which the FCC defines "to be an activity wherein one entity *subscribes* to the communications services and facilities of another entity and then re-offers communications services to the public ... for profit." *Resale and Shared Use,* 60 F.C.C.2d at 271 (emphasis added).

There is no evidence before the Court that OOI ever subscribed to a long-distance service and then resold that service to third parties. With respect to its relationship to TNC, the contractual language made it clear that TNC was ultimately responsible to provide service, and OOI had no financial liability to TNC for the services used by CommunitySpirit customers. Thus it cannot be fairly said that OOI was providing long-distance service to those customers. Rather, as TNC itself concedes, OOI acted as agent or broker which provided names of new customers to TNC.

As to OOI's activities after February 17, 1994, the evidence before the court is insufficient to determine the precise nature of OOI's relationship with AmeriConnect, and the relationship, if any, that AmeriConnect formed with the disputed customers. It is therefore impossible to say on the evidence before me whether the new authorizations solicited by OOI were effective PIC changes of disputed customers. What is clear, however, is that the customers who did sign OOI-solicited authorizations in the post-February 17 period expressed a definite intention not to be associated with TNC, and to terminate whatever relationship with TNC they might have had previously.

### B. Whether FCC Regulations Prohibit OOI From Acting as Agent for Telephone Customers

■ TNC points to no FCC ruling or regulation prohibiting OOI from acting as an agent for telephone customers, or to any ruling or regulation restricting that right to common carriers. Rather, TNC stresses that, in all of its rulings and regulations on the subject of PIC changes, the FCC addresses only one kind of change in primary carrier—PIC change orders solicited by long distance carriers—and thus seems to suggest that only common carriers may effect such changes. From this silence, TNC concludes that the methods the FCC has prescribed are exclusive. Under this logic, OOI, which is not a common carrier, cannot therefore effectuate PIC changes on behalf of custom-

ers. I find the FCC's intent in this area less clear than TNC suggests.

Turning to the regulatory language itself, I note that there are currently two FCC rules which govern the selection of a primary long distance carrier by consumers. The FCC's original 1985 ruling (as modified) requires a long distance carrier to take steps to obtain a Letter of Agency from a customer before submitting primary long distance carrier change order to a local telephone company. *Investigation of Access*, 101 F.C.C.2d 911 at Appendix B, ¶ 11, *as modified by Investigation of Access (Waivers)*, 101 F.C.C.2d 935 at ¶ 21(1). Although a carrier may submit a primary long distance carrier change order before actually receiving a Letter of Agency, it is still required to take steps to secure a Letter of Agency in order to provide evidence of a customer's intent to switch in case of a future dispute. Under the terms of the 1985 ruling, carriers are required to keep Letters of Agency on file for a period of one year.

Although the FCC's 1985 rule remains generally applicable to long distance carrier induced PIC changes, it has been superseded in part by more recent FCC action with respect to PIC change orders obtained through telemarketing. Because of the special potential for abuse of consumer authorizations obtained through telemarketing, the FCC promulgated a regulation which requires long distance carriers (also known as "interexchange carriers" or "IXCs") to take special steps to verify these authorizations. Thus a carrier which solicits new customers by telephone may not submit PIC changes to a local phone company (LEC) until *after* verification is obtained, through one of four methods described in the regulation. 47 C.F.R. § 64.1100.

The allegations in the instant case, however, involve neither a solicitation by an IXC, nor a PIC change submitted to a local carrier. Rather, the allegation is that OOI, which all parties agree is not an IXC, submitted change orders to Sprint, an IXC, but not a local carrier (LEC). OOI's actions were intended to benefit yet a third entity (Ameri-Connect), which is a switchless reseller (and therefore an IXC), but which was not, apparently, involved in solicitations from potential customers.[8] Moreover, no one alleges telemarketing abuses of the sort the regulations were designed to address.

The fundamental issue is whether the FCC regulatory framework covers the field, i.e., whether it provides the only way for customers to switch primary carriers, or whether it was designed to deal with a particular kind of abuse—telemarketing abuses by IXCs—in a fiercely competitive market—leaving open other ways of effecting a change in one's primary carrier.

I am unwilling, in the absence of a definitive FCC interpretation to the contrary, to expand the limited scope of the FCC's PIC-change and telemarketing rules and find an implied prohibition on OOI's ability to act as an agent for customers in connection with the provision of long-distance telephone service. Not only do the FCC PIC-change rules not encompass OOI's alleged actions by their terms, but it is not clear to me that the extension of those rules would further the FCC's regulatory goals.

The FCC's original 1985 *Investigation of Access* plan, which provided the initial rule

8. As both parties appear to acknowledge, the relationship between TNC and OOI is somewhat unusual in the telecommunications industry. OOI states that TNC's initial intention was to purchase the right to use OOI's database of HIV+ individuals, and market to them directly, perhaps in conjunction with OOI's service marks. OOI insisted, however, in playing an active role in the CommunitySpirit marketing campaign, and, in fact, became a very active participant in what became the CommunitySpirit joint venture. It was OOI, not TNC, that dealt directly with potential customers, and its promotional literature placed great stress on OOI's "lesbigay" corporate identity, the idea that pa-

tronizing CommunitySpirit meant keeping money within the lesbigay community, and that lesbigay charities would benefit from the contributions which OOI promised to make from the receipts of the enterprise.

At the same time, because OOI was legally prohibited from actually selling long-distance service, CommunitySpirit customers necessarily entered (perhaps not fully realizing it) into a contractual relationship with TNC, which in fact provided them with the long-distance service they ordered. OOI claims that a TNC executive stated that TNC's relationship with OOI was unlike any that TNC had with any other party.

regulating PIC changes, was directed principally at local carriers, directing them to implement the equal access provisions of the AT & T consent decree, and to process primary long distance carrier (PIC) change requests from customers or from long distance carriers. 101 F.C.C.2d 911, Appendix B at ¶ 1. While the plan imposes procedural requirements on *IXCs* wishing to submit change orders on behalf of customers, it does not by its terms prohibit customers from requesting (and receiving) PIC changes through any other means.

The FCC's telemarketing rule, 47 CFR § 64.1100, is even more limited in its scope. It states that "No IXC shall submit to a LEC a [PIC] change order generated by telemarketing unless and until the order has been confirmed" using one of the methods described in the rule. Once again, there is no suggestion in the plain language of the rule of an intent to regulate the activities of independent agents (which is what OOI claims to be here), and in particular the relations between that agent and an underlying carrier such as Sprint.

Ultimately, the FCC's principal goal in its regulation of PIC switching has always been to insure that the right of consumers to choose their long-distance service was not undermined. Although the FCC has not had occasion to determine whether its regulations apply to activities such as OOI's, it has repeatedly stressed that its purpose is to advance the consumer's interest, to "protect consumers against unwanted changes in their long distance service" and to "benefit consumers without unreasonably burdening competition in the interexchange market." *See Changing Long Distance Carriers,* 7 F.C.C.Reg. 1038 (1991) at ¶¶ 5, 42, 45.[9] This goal is obviously served by rules which prohibit IXCs from submitting change orders based on unverified telemarketing contacts. However it is far less clear that a prohibition on OOI's activities here would be similarly advantageous to consumers. It is apparent from the undisputed evidence that few if any

CommunitySpirit customers were familiar with TNC, or were even aware that TNC was their actual provider of long-distance service. It is equally apparent that a significant selling point of the CommunitySpirit service, and one which induced consumers to select it, was its "lesbigay" identity and its financial contributions to "lesbigay" related charities. These were features which OOI, not TNC, brought to the service, and it is at least unclear whether the disputed customers would have chosen to stay with TNC, if they had the choice to switch to a new carrier selected by OOI. Given the poorly defined nature of "consumer choice" in this context, any extension of regulations in this area is best left to the expertise of the FCC, not this Court.

### C. *Whether OOI in Fact was Authorized to Change Primary Carriers under its Contractual Relationship with its Customers*

Assuming OOI can, under the FCC regulations, act as an agent for its customers in changing PICs, the question remains whether any evidence supports OOI's claim that it did so—i.e., that it had the authority to submit PIC change orders on behalf of the disputed customers. As explained above, shortly after February 17, 1994, OOI contacted Sprint and induced Sprint to switch all of TNC's disputed customers to AmeriConnect. TNC soon prevailed upon Sprint to reverse this action. TNC claims that the original Letters of Agency authorize it to continue to provide service to the disputed customers indefinitely, or at least until new Letters of Agency are executed. OOI claims that it has, by virtue of its contractual relationship with the disputed customers and/or by the effect of the original CommunitySpirit Letters of Agency, full agency authority to select a new PIC on those customer's behalf. OOI also claims to have solicited at least 5,000 new Letters of Agency from disputed customers, reestablishing a relationship with

---

9. Courts ordinarily look to an administrative agency's interpretation of its own regulations, which must be respected unless an "alternative reading is compelled by the regulation's plain language or by other indications of the [agency's]

intent at the time of the regulation's promulgation." *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988).

"CommunitySpirit" and explicitly terminating any relationship with TNC.

"An agency relationship has three essential characteristics: 1) the power of the agent to alter the legal relationships between the principal and third parties and the principal and himself; 2) the existence of a fiduciary relationship toward the principal with respect to matter within the scope of the agency; and 3) the right of the principal to control the agent's conduct with respect to matters within the scope of the agency. Restatement (Second) of Agency §§ 12–14 (1958)." *Sabel v. Mead Johnson & Co.,* 737 F.Supp. 135, 138 (D.Mass.1990). The existence and extent of an agency relationship is ordinarily a question of fact to be decided by a jury. *E.g. White's Farm Dairy, Inc. v. De Laval Separator Co.,* 433 F.2d 63, 66 (1st Cir.1970). "It is to be determined from all the evidence and reasonable inferences to be drawn therefrom." *Id.*

In the instant case, the evidence of an agency relationship between OOI and the disputed customers is clouded at best. OOI solicited at least 5 different types of authorizations from prospective CommunitySpirit customers. One was in the form of a check payable to the customer. The location for indorsing the check contains a statement that "I confirm that I have authorized that my long distance service be switched to Members' Long Distance Advantage Program." Members' Long Distance Advantage Program ("MLDA") is a service mark of TNC.

Another type of authorization took the form a "survey" which was distributed at a 1993 gay rights march in Washington, DC. The survey stated that it was being conducted by Overlooked Opinions, "the official Market Research Company for the March on Washington, and the nation's only opinion polling group dedicated to our community." In addition to a series of market research questions, the survey offered respondents the opportunity to "flex[ ] our economic clout," by subscribing to CommunitySpirit "the Official Long Distance Company for the '93 March on Washington." The surveys stated that Overlooked Opinions was "proud to announce" CommunitySpirit, and the forms were to be returned to Overlooked Opinions at a Chicago mailing address. The language on this form "authorizes CommunitySpirit/MLDA to provide my long distance service for the phone numbers listed below and to notify my local phone company of the change."

Yet another authorization was part of a conventional magazine advertisement, which solicited customers to switch to "CommunitySpirit". The authorization language on the coupon states that "My signature authorizes CommunitySpirit—MLDA to provide my long distance service for the phone number listed above and to notify my local telephone company of the change."

Finally, another authorization format consisted of a list of gay, lesbian and HIV related organizations to which the customer could direct a contribution equal to 2% of her phone charges. The authorization language on this form states that "I realize that my signature authorizes a switch of my current long distance carrier to the CommunitySpirit long distance program and that donations will be made to the organizations I selected above in accordance with CommunitySpirit policies."

In addition to the authorizations solicited prior to February 17, 1994, OOI began a campaign after that date to obtain new authorizations from disputed customers, and claims to have received in excess of 5,000 of these. These authorizations contain the following language:

> "I want CommunitySpirit *not* Trans National Communications to be my long distance carrier. My signature re-authorizes and authorizes CommunitySpirit to convert the numbers listed above to CommunitySpirit—a *gay and lesbian owned and operated* long distance company. This Letter of Agency (LOA) supersedes all previous LOA's including any and all LOA's granted to or held by TNC ..."

Taking, as I must, all of OOI's evidence as true and making all inferences from the evidence in its favor, *Aponte–Santiago,* 957 F.2d at 41, I find that OOI has raised a material issue of fact as to whether it was authorized by CommunitySpirit customers to select a long-distance carrier on their behalf. With

respect to the pre-February 17, 1994 Letters of Agencys, I conclude that a reasonable jury could find that the disputed customers intended to enter into a business relationship with OOI in which OOI would be authorized to do whatever was required to effectuate the provisions of the CommunitySpirit program, including selecting an FCC authorized provider of long-distance service. The evidence for this is not only in the language of the Letters of Agencys themselves, many of which name "CommunitySpirit", OOI's service mark, as the long-distance service, but in the promotional material which accompanied those Letters of Agencys, and which stress the association of OOI with CommunitySpirit.

The evidence is even more compelling with respect to the post-February 17, 1994 Letters of Agencys which OOI solicited. Those Letters of Agency specifically disassociate the customers from TNC, and reaffirm a desire to associate with the CommunitySpirit program which, in this context, obviously refers to OOI.

## IV. CONCLUSION

The breakup of the Bell system and the partial deregulation of the long-distance telephone market has resulted in a shift in the way in which consumers must understand their relationship to the telephone infrastructure. "The phone company" is no longer a monolithic integrated "system." It has been replaced by a constellation of market actors, selling a myriad of previously unknown products and services. In the aftermath of such a shift, regulation must catch up with the various kinds of commercial relationships which the new paradigm entails.

As the foregoing discussion illustrates, it has not. It regulated in only one area—telemarketing by long distance carriers which resulted in substantial customer confusion. It did not regulate the behavior at issue here. CommunitySpirit's advertising materials clearly left many customers without a meaningful understanding of their rights relative to either OOI or TNC, or of the means by which their long-distance service was actually provided. At the same time, a full explanation of the methods of the switchless resale industry, or of the details of the TNC–OOI relationship, would obviously have diluted the message which CommunitySpirit advertising was intended to convey.

Only regulation, perhaps in the form of mandatory disclosure language, applying to all marketers of long distance service, will insure that consumers are able to make fully informed decisions in connection with the purchases of the type of packaged long distance service illustrated in this case. This Court, obviously, has no power to issue such a regulation.

For the foregoing reasons, defendant's motion for summary judgment is **DENIED. SO ORDERED.**